**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| CELSIUS NETWORK LLC, *et al.*, | § § | Case No. 22-10964 (MG) |
| Post-Effective Date Debtors.[1] | § § § | (Jointly Administered) |
| | § § | |
| CELSIUS NETWORK LLC, *et al.*, | § § | |
| Post-Effective Date Debtors, | § § | Adv. Proc. No.  24-03997 |
| Plaintiff, | § § | |
| v. | § § | |
| SYMBOLIC CAPITAL PARTNERS LTD, | § § | |
| Defendant. | § § § | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Celsius Network LLC (2148); Celsius KeyFi LLC (4414); Celsius Lending LLC (8417); Celsius Mining LLC (1387); Celsius Network Inc. (1219); Celsius Network Limited (8554); Celsius Networks Lending LLC (3390); Celsius US Holding LLC (7956); GK8 Ltd (1209); GK8 UK Limited (0893); and GK8 USA LLC (9450).  The location of Debtor Celsius Network LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 50 Harrison Street, Suite 209F, Hoboken, New Jersey 07030.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................. 3

I.     Relevant Parties ................................................................................................. 3

II.    The Parties' Business Relationship ................................................................... 3

III.   Celsius and Crypto Markets Enter a Period of Intense Turmoil ....................... 4

IV.   Celsius Files for Bankruptcy ............................................................................. 6

V.    Plaintiff Initiates This Adversary Proceeding ................................................... 6

I.     Plaintiff's Claims Are Barred by 11 U.S.C. § 546(e) ....................................... 8

     A.    The Challenged Transfers Are Protected Margin or Settlement Payments
          Under 11 U.S.C. §546(e) ........................................................................ 9

          1.    The Challenged Transfers Are Margin Payments ...................................... 9

          2.    The Challenged Transfers Are also Settlement Payments ....................... 11

          3.    The Master Loan Agreement and Loan Term Sheets Are Forward
               Contracts ................................................................................................... 13

          4.    Both Celsius and Symbolic Are Forward Contract Merchants ............... 15

     B.    The Challenged Transfers Were Made by Forward Contract Merchants in
          Connection with a Forward Contract ...................................................... 16

II.    Plaintiff's Amended Complaint Is Untimely ................................................... 18

     A.    Plaintiff Did Not Serve Symbolic with the Complaint on Time ......................... 18

     B.    Plaintiff's Failure to Serve Symbolic with the Complaint Is a Result of Its
          Own Neglect ........................................................................................... 19

     C.    The Court Should Not Grant Plaintiff a Discretionary Extension ...................... 21

          1.    The Statute of Limitations Would Bar Plaintiff's Claims ....................... 21

          2.    Symbolic Was Unaware of the Current Action Until It Was Served ...... 22

          3.    Symbolic Could Not Have Concealed the Defect in Service ................. 23

          4.    Symbolic Will Suffer Prejudice ............................................................. 23

III.   Plaintiff's Amended Complaint Should Be Dismissed With Prejudice .......................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*123RF LLC v. HSBC Bank USA, N.A.*,
663 F.3d 391 (S.D.N.Y. 20223)...................................................................8

*In re Adler Coleman Clearing Corp.*,
204 B.R. 111 (Bankr. S.D.N.Y. 1997)........................................................11

*Allaire Corp. v. Okumus*,
433 F.3d 248 (2d Cir. 2006)........................................................................7

*In re Barnett*,
2015 WL 9581384 (Bankr. S.D.N.Y. Dec. 29, 2015)................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................7

*In re Bernard L. Madoff Invs. Sec. LLC*,
773 F.3d 411 (2d Cir. 2014).......................................................................17

*Blanco v. Success Acad. Charter Schs., Inc.*,
722 F. Supp. 3d 187 (S.D.N.Y. 2024)........................................................20

*In re Borden Chemicals and Plastics Operating Ltd. Partnership*,
336 B.R. 214 (Bankr. D. Del. 2006) ..........................................................12

*In re Boston Generating, LLC*,
2024 WL 4234886 (2d Cir. Sept. 19, 2024) ..............................................18

*Cassano v. Altshuler*,
186 F. Supp. 3d 318 (S.D.N.Y. 2016)..............................................8, 22, 23

*CFTC v. McDonnell*,
287 F. Supp. 3d 213 (E.D.N.Y. 2018) .......................................................15

*In re Clean Burn Fuels, LLC*,
540 B.R. 195 (Bankr. M.D.N.C. 2015).......................................................12

*In re Comark*,
971 F.2d 322 (9th Cir. 1992) .....................................................................10

*Counter Terrorist Grp. U.S. v. New York Mag.*,
374 F. App'x 233 (2d Cir. 2010) ..........................................................20, 21

*Dale v. L'Oreal USA, Inc.*,
2023 WL 3984345 (E.D.N.Y. June 13, 2023) ...........................................25

*In re David*,
193 B.R. 935 (Bankr. C.D. Cal. 1996)...........................................................................9

*E. Refractories Co. v. Forty Eight Insulations, Inc.*,
187 F.R.D. 503 (S.D.N.Y. 1999) .................................................................................19

*Fantozzi v. City of New York*,
343 F.R.D. 19 (S.D.N.Y. 2022) ..............................................................................23, 24

*In re First Class Import, Inc.*,
2009 WL 7215673 (Bankr. E.D.N.Y. Jan. 13, 2009) .............................................1, 15

*George v. Pro. Disposables Int'l Inc.*,
221 F. Supp. 3d 428 (S.D.N.Y. 2016)...................................................8, 21, 22, 23

*Gong v. Sarnoff*,
2023 WL 8096970 (S.D.N.Y. Nov. 21, 2023)..............................................................19

*In re iFinex Inc.*,
CFTC Docket No. 22-05 (Oct. 15, 2021) ....................................................................15

*Kaiser Steel Corp. v. Charles Schwab & Co.*,
913 F.2d 846 (10th Cir. 1990) ......................................................................................9

*Kogan v. Facebook, Inc.*,
334 F.R.D. 393 (S.D.N.Y. 2020) .....................................................................21, 22, 24

*In re Laurel Valley Oil Co.*,
2013 WL 832407 (Bankr. N.D. Ohio Mar. 5, 2013) ...................................................12

*In re Lehman Bros. Holdings Inc.*,
855 F.3d 459 (2d Cir. 2017).........................................................................................14

*LiveIntent, Inc. v. Naples*,
293 F. Supp. 3d 433 (S.D.N.Y. 2018)............................................................................8

*Lozada v. TaskUs, Inc.*,
710 F. Supp. 3d 283 (S.D.N.Y. 2024)............................................................................5

*In re Magnesium Corp. of Am.*,
460 B.R. 360 (Bankr. S.D.N.Y. 2011)...........................................................12, 15, 16

*Mangiafico v. Blumenthal*,
471 F.3d 391 (2d Cir. 2006).........................................................................................25

Page(s)

*In re Merrill Lynch Co., Inc.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)..................................................................5

*In re Nine West LBO Sec. Litig.*,
    87 F.4th 130 (2d Cir. 2023) .............................................................................8

*In re Olympic Natural Gas Co.*,
    294 F.3d 737 (5th Cir. 2002) .........................................................................12

*Owoyemi v. Credit Corp. Sols.*,
    596 F. Supp. 3d 514 (S.D.N.Y. 2022)............................................................24

*Perkins v. Lehman Bros., Inc.*,
    2012 WL 11946959 (N.D. Ga. Mar. 30, 2012)........................................10, 11

*In re Postiglione*,
    2019 WL 2590946 (Bankr. E.D.N.Y. June 24, 2019) .....................................14

*Primavera Familienstifung v. Askin*,
    130 F. Supp. 2d 450 (S.D.N.Y. 2001)............................................................11

*In re Renew Energy LLC*,
    463 B.R. 475 (Bankr. W.D. Wisc. 2011) ........................................................13

*In re Renshaw*,
    222 F.3d 82 (2d Cir. 2000)..............................................................................14

*Sikhs for Justice v. Nath*,
    893 F. Supp. 2d 598 (S.D.N.Y. 2012).......................................................18, 25

*In re Stewart Fin. Co.*,
    367 B.R. 909 (Bankr. M.D. Ga. 2007).....................................................9, 10, 11

*In re Teligent*,
    485 B.R. 62 (Bankr. S.D.N.Y. 2013)..............................................................22

*Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*,
    966 F. Supp. 2d 282 (S.D.N.Y. 2013).............................................................20

*Zapata v. City of New York*,
    502 F.3d 192 (2d Cir. 2007)................................................................. *passim*

**Statutes**

11 U.S.C.
    § 101(25)........................................................................................................14
    § 101(26)........................................................................................................15
    § 101(38)..........................................................................................................9
    § 101(51A).....................................................................................................11
    § 101(54)(D).................................................................................................14
    § 502(d)............................................................................................................7
    § 546(a)..............................................................................................6, 24, 25
    § 546(e)................................................................................................. *passim*
    § 547(b).....................................................................................................7, 16
    § 550(a)............................................................................................................7
    § 741(5)............................................................................................................9
    § 761(8)..........................................................................................................15
    § 761(15)..........................................................................................................9

**Other Authorities**

Federal Rule of Bankruptcy Procedure
    7004...............................................................................................................18
    7012(b)........................................................................................................3, 7

Federal Rule of Civil Procedure
    4.......................................................................................................... *passim*
    12(b)(5).......................................................................................................7, 8
    12(b)(6).......................................................................................................7, 8

Complaint, *CFTC v. Eisenberg*,
    No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), ECF No. 1 .......................................15

Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by
    Amendments Thereto, to List and Trade Shares of Ether-Based Exchange-
    Traded Products, Exchange Act Release No. 34-100224, SEC Docket (CCH)
    2868062 (May 23, 2024)...............................................................................15

<u>**TABLE OF ABBREVIATIONS**</u>

| | |
|---|---|
| **Symbolic** | Symbolic Capital Partners Ltd., Defendant in the above-captioned action. |
| **Celsius** | Celsius Network LLC and its Debtor affiliates. |
| **Plaintiff** | The Post-Effective Date Debtors in the above-captioned action and their representative, the Blockchain Recovery Investment Consortium, LLC, Litigation Administrator and Complex Asset Recovery Manager. |
| **Complaint** | The complaint filed in the above-captioned action on July 13, 2024, at ECF No. 1. |
| **Amended Complaint or Am. Compl.** | The complaint filed in the above-captioned action on August 12, 2024, at ECF No. 7. |
| **Docket** | The docket in the above-captioned action. |
| **Challenged Transfers** | The six transfers from Celsius to Symbolic of additional collateral in the form of ETH listed in Exhibit A to the Complaint and Amended Complaint. |
| **Master Loan Agreement** | The October 21, 2021, agreement between Celsius and Symbolic attached as Exhibit B to the Complaint and Amended Complaint. |
| **Loan Term Sheets** | The February 24, 2022, and April 6, 2022, term sheets entered into by Celsius and Symbolic attached as Exhibit C to the Complaint and Amended Complaint. |
| **USDC** | A "stablecoin" with its value pegged to the U.S. Dollar. |

## PRELIMINARY STATEMENT

The initiation of this case has been marked by sloppiness and a blatant failure to follow the basic rules of litigation. Plaintiff, represented by sophisticated counsel, waited until the last day under the statute of limitations to file its Complaint, along with a motion seeking to file exhibits to the Complaint under seal. Neither the Complaint nor the motion to seal was ever served on Symbolic. After the Court substantially denied the motion to seal, Plaintiff refiled the same Complaint a month later, as the "Amended Complaint," after the statute of limitations to assert preference avoidance claims expired. The Amended Complaint, too, was never served on Symbolic until October 21, 2024, 100 days after Plaintiff's last-minute Complaint was filed and ten days past the outer limit for service allowed by Rule 4. While this delay can be forgiven in certain circumstances, here there is no excuse for Plaintiff's failure to timely serve Symbolic: not only is Symbolic a Delaware entity, Symbolic even filed proofs of claim in the underlying bankruptcy cases with its contact information. But Plaintiff's sloppiness does not end there. Plaintiff's claims fall squarely within the plain language of section 546(e)'s safe harbor and should never have been brought in the first place. The outcome of this case therefore should be cut and dry: the Court should dismiss the Amended Complaint with prejudice for two separate reasons.

*First*, all the claims are barred under Bankruptcy Code section 546(e). Section 546(e) mandates dismissal because all the Challenged Transfers were either (1) margin or settlement payments made by or to (or for the benefit of) a forward contract merchant, or (2) transfers made by or to (or for the benefit of) a forward contract merchant in connection with a forward contract. If the Challenged Transfers fit into either of these safe harbors, the Court must dismiss the Amended Complaint. Here, the Amended Complaint and the Master Loan Agreement attached to the Amended Complaint specify that Symbolic lent Celsius digital assets pegged to the U.S. Dollar

in exchange for collateral in the form of the native cryptocurrency of the Ethereum blockchain: ETH. The parties' agreement provided that when the value of ETH decreased, Symbolic was entitled to request additional ETH in the form of "margin calls" to rebalance the loan-to-collateral ratio. These margin calls are classic margin or settlement payments, and the Master Loan Agreement is a classic forward contract for the loan or transfer of a commodity, here ETH. By definition, the transfers are therefore all either margin or settlement payments made by or to a forward contract merchant or otherwise transfers made by or to a forward contract merchant in connection with a forward contract. Either way, there are no facts Plaintiff could allege that would escape the inevitable conclusion that the Challenged Transfers are protected by the safe harbors under section 546(e).

*Second*, Plaintiff failed to timely serve the Complaint and Amended Complaint. There is no debate that Plaintiff did not serve the Amended Complaint within the 90-day window afforded by Rule 4(m) after initiating this adversary proceeding. Plaintiff has no excuse for this failure. After waiting until the last possible day to file the Complaint before the statute of limitations expired, Plaintiff then (a) moved to file the exhibits to the Complaint under seal, (b) never served the initial Complaint on Symbolic, (c) never served the motion to seal on Symbolic either, despite representing to the Court otherwise, (d) still waited more than ten days after the 90-day deadline to serve Symbolic with the Amended Complaint, even though (e) Symbolic is a Delaware entity that filed proofs of claim in these cases and for whom Celsius (and Plaintiff) had contact information. While courts will sometimes exercise discretion and excuse a plaintiff's failure to strictly follow service deadlines, that is not the case where a plaintiff made a series of blunders that could have easily been avoided with minimal due diligence and care. Even if this lawsuit had merit, Symbolic should not be forced to defend this case when Plaintiff could not be bothered to

diligently initiate and pursue it.

Accordingly, Plaintiff's Amended Complaint should be dismissed with prejudice.[2]

## STATEMENT OF FACTS[3]

### I. RELEVANT PARTIES

Celsius was a global cryptocurrency platform on which users could deposit and store various cryptocurrencies. Am. Compl. ¶ 1. Celsius facilitated lending and borrowing for its users and offered depositors interest on qualified deposits. Shamah Decl. Ex. 1, at 102-104. Celsius offered its product to individuals, but also to institutional clients such as funds and market-makers on both a secured and unsecured basis. Am. Compl. ¶ 1.

Symbolic was one of those institutional clients. Symbolic is a proprietary trading firm incorporated in Delaware and based in the United States. *Id.* ¶ 10. As part of its business, Symbolic lends ETH and other digital assets. *Id.* Exs. B-C.

### II. THE PARTIES' BUSINESS RELATIONSHIP

On October 21, 2021, Symbolic and Celsius entered into a Master Loan Agreement under which Celsius could borrow cryptocurrency or other assets from Symbolic. *Id.* ¶ 29. The Master Loan Agreement allowed Symbolic to make three types of loans to Celsius: (1) a "Fixed Term Loan," which had a fixed maturity date and no prepayment option for the borrower or call option for the lender; (2) a "Term Loan with Prepayment Option," which had a fixed maturity date and a

---

[2] Pursuant to Federal Rule of Bankruptcy Procedure 7012(b), Symbolic does not consent to entry of a final order by the Bankruptcy Court.

[3] This Statement of Facts is taken from the allegations in the Amended Complaint and the documents cited and incorporated by reference therein, which are assumed to be true for purposes of this motion only. All Exhibits are attached to the Declaration of Daniel Shamah, filed contemporaneously with this Motion.

prepayment option for the borrower; or (3) an "Open Loan," which had no designated maturity date, a prepayment option for the borrower, and a call option for the lender. *Id.*

Upon the closing of a transaction under the Master Loan Agreement, Celsius was required to transfer an agreed upon amount of cryptocurrency or fiat currency to Symbolic as collateral for the loan. *Id.* ¶ 30. Under the terms of the Master Loan Agreement, Symbolic had a "continuing first priority security interest in, and lien upon" that collateral, which attached once Symbolic made a loan to Celsius and terminated once Celsius paid back the loan balance. *Id.* The Master Loan Agreement also provided for a "Balancing Transfer" arrangement under which the parties agreed that the ratio of the borrowed amount to the collateral would remain within certain parameters. *Id.* ¶ 31. In other words, if the ratio of the quoted value of the collateral to the quoted value of the loaned assets rose above or fell below a particular number, either Symbolic or Celsius would transfer assets to the other party to bring the proportion back within range. *Id.*

The Parties ultimately agreed to two relevant transactions under the Master Loan Agreement. *Id.* ¶¶ 32-33. The first was a February 24, 2022, loan for 15,000,000.00 USDC for a term of six months. *Id.* ¶ 32. The second was an April 6, 2022, loan for 10,000,000.00 USDC for a term of three months. *Id.* ¶ 33. Celsius transferred 6,276.15 ETH and 3,053.77 ETH to Symbolic as collateral for the February and April USDC loans, respectively. *Id.* ¶¶ 32-33. As of April 14, 2022, Symbolic held 7,499.94 ETH as collateral for the loans. *Id.* ¶ 34.

## III. CELSIUS AND CRYPTO MARKETS ENTER A PERIOD OF INTENSE TURMOIL

Shortly thereafter, on April 15, 2022, a court order forced Celsius to publicly disclose the regulatory issues that had been plaguing it for over a year. *Id.* ¶ 19. This caused a run of withdrawals from Celsius' platform. *Id.* Right around the same time, cryptocurrency markets entered a period of massive volatility. *Id.* ¶ 34. On May 7, the cryptocurrency token TerraUSD,

a supposed "stablecoin" that was pegged to the U.S. Dollar, collapsed. *Id.* ¶ 20. This sent shockwaves through the entire crypto industry and caused customers to continue withdrawing assets from Celsius' platform. *Id.* ¶¶ 21-23. To stop the run on its reserves, Celsius paused all withdrawals from its platform on June 12, 2022. *Id.* ¶ 24. Notably, this pause did not apply to participants in Celsius' Institutional Lending Program, like Symbolic. *Id.* ¶¶ 1, 24.

By June 16, 2022, the price of ETH was less than a third of what it was on April 14, 2022, meaning that the collateral Symbolic received against the loans it provided to Celsius was significantly devalued. *Id.* ¶ 34. As Symbolic had a right to do under the Master Loan Agreement and Loan Term Sheets, it made six separate requests for balancing transfers between May 9 and June 13 of 2022, pursuant to which Symbolic received more ETH from Celsius to rebalance the ratio of the collateral it held to Celsius' outstanding loan balance. *Id.* ¶ 35, Ex. A. Those transfers totaled 11,585.46 ETH, for a dollar value of between $14 million and $21 million, depending on whether you apply the closing price of ETH on the date of each margin call or the closing price on June 15, 2022, the date of liquidation.[4] *Id.* Ex. A; Yahoo! Finance – Ethereum Historical Data, https://finance.yahoo.com/quote/ETH-USD/history/ (last visited February 18, 2025).[5] On June 15, 2022, Symbolic notified Celsius of its continuing default under the Master Loan Agreement and exercised its contractual right to foreclose on and liquidate the 18,426.18 ETH it held as collateral. Am. Compl. ¶ 36.

---

[4] The transfers were made on May 9, 12, and 29, and June 11 and 13, 2022. Ex. A. The closing price of ETH in U.S. Dollars on those dates was $2.245.43, $1,961.70, $1,812.03, $1,529.66, and $1,204.58 respectively.

[5] The Court may take judicial notice of public quotations of stock prices. *See Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 299 n.9 (S.D.N.Y. 2024); *In re Merrill Lynch Co., Inc.*, 272 F. Supp. 2d 243, 254 n.9 (S.D.N.Y. 2003).

## IV.   CELSIUS FILES FOR BANKRUPTCY

Celsius filed for bankruptcy a month later, on July 13, 2022.  *Id.* ¶ 1.  Symbolic filed proofs of claim in the underlying bankruptcy.  *Id.* ¶ 42.  Proof of claim number 9665 is an unsecured claim based on outstanding principal Celsius owed Symbolic pursuant to the Loan Term Sheets, as well as late fees, and accrued and unpaid interest.  *Id.*  Proof of claim number 32632 amended claim number 9665 and added a secured claim for the return of the collateral posted by Symbolic under an August 6, 2021, master loan agreement between Celsius as lender and Symbolic as borrower.  *Id.*  That claim seeks a right to set off the value of the collateral posted by Symbolic against the digital assets borrowed by Celsius.  *Id.*  Proof of claim number 32632 also asserts a secured claim for the excess value of Symbolic's collateral left after the right of setoff.  *Id.*  Finally, Symbolic filed proof claim number 32633, which asserts the same claims as 32632.  *Id.*

## V.   PLAINTIFF INITIATES THIS ADVERSARY PROCEEDING

Plaintiff initiated this adversary proceeding on July 13, 2024, ECF No. 1, the last day before its preference claims would be barred under Bankruptcy Code section 546(a).  Plaintiff filed the Complaint along with a motion to seal, seeking permission to file Exhibits B and C to the Complaint entirely under seal.  ECF No. 2.  Neither the initial Complaint nor the motion to seal were ever served on Symbolic, despite Plaintiff's representation in the motion to seal that it would "provide notice of this Motion to the following parties or their respective counsel: Symbolic Capital Partners Ltd."  ECF No. 2 ¶ 21.  On August 2, 2024, the Court issued an Order on Plaintiff's motion to seal, directing Plaintiff to refile the Complaint with certain portions of Exhibits B and C redacted.  ECF No. 5.  On August 7, 2024, the Court issued the summons with notice of pre-trial conference.  ECF No. 6.

Plaintiff refiled the Complaint on August 12, 2024. ECF No. 7. Plaintiff misleadingly styled the filing as an "Amended Complaint," even though the Amended Complaint was identical to the Complaint in all respects (it was even dated July 13, 2024), with the sole exception being the Court-mandated change to the sealing treatment of Exhibits B and C. *Compare* ECF No. 1 *with* ECF No. 7. On October 18, 2024, Plaintiff requested that the Court issue a second summons. It did so that same day. ECF No. 8. Only on October 21, 2024, 100 days after Plaintiff initiated this adversary proceeding, did Plaintiff finally serve Symbolic with a copy of the Complaint, "amended" or not. ECF No. 9.

The Amended Complaint sets forth three causes of action. Am. Compl. ¶¶ 48-66. First, Plaintiff alleges that the Challenged Transfers are avoidable, preferential transfers under 11 U.S.C. § 547(b) that should be set aside. *Id.* ¶¶ 48-57. Second, Plaintiff alleges that it is entitled to recover the property transferred in the Challenged Transfers for the benefit of the estate under Section 550(a) of the Bankruptcy Code. *Id.* ¶¶ 58-62. Third, Plaintiff alleges that the proofs of claim Symbolic filed in the underlying bankruptcy should be disallowed under 11 U.S.C. § 502(d), because it owes the estate the property it obtained in the Challenged Transfers. *Id.* ¶¶ 63-66.

## LEGAL STANDARD

A complaint must be dismissed if it does not allege facts sufficient to state a cognizable claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6).[6] While the Court must accept as true all well-pleaded factual allegations, the claim may still fail as a matter of law if the plaintiff cannot prove any set of facts that would render it legally feasible. *Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006). "In considering a motion to dismiss for failure

---

[6] Federal Rules of Civil Procedure 12(b)(5) and 12(b)(6) are made applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7012(b).

to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the [pleading] as exhibits, and documents incorporated by reference in the [pleading]." *LiveIntent, Inc. v. Naples*, 293 F. Supp. 3d 433, 440 (S.D.N.Y. 2018) (quoting *DiFalco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010)).

While Bankruptcy Code section 546(e) is an affirmative defense, the Court can grant a motion to dismiss where the "facts supporting the [affirmative] defense appear on the face of the complaint" or appear in materials that the Court may consider because they have been incorporated into a complaint. *In re Nine West LBO Sec. Litig.*, 87 F.4th 130, 142 (2d Cir. 2023). The Master Loan Agreement and Loan Term Sheets were attached to the Amended Complaint as Exhibits B and C, and the Court may consider them on this motion. *See 123RF LLC v. HSBC Bank USA, N.A.*, 663 F.3d 391, 397 (S.D.N.Y. 20223).

The Court may also dismiss a complaint under Rule 12(b)(5) for insufficient service of process. *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 320 (S.D.N.Y. 2016). In deciding a motion under Rule 12(b)(5), courts look to Federal Rule of Civil Procedure 4, which governs service of process. *George v. Pro. Disposables Int'l Inc.*, 221 F. Supp. 3d 428, 432 (S.D.N.Y. 2016). Once a defendant challenges service of process, the burden is on the plaintiff to show that service was adequate. *Cassano*, 186 F. Supp. 3d at 320.

## ARGUMENT

### I. PLAINTIFF'S CLAIMS ARE BARRED BY 11 U.S.C. § 546(E)

The Amended Complaint must be dismissed because the Challenged Transfers are not avoidable under Bankruptcy Code section 546(e), which bars a trustee from avoiding any preferential transfer. As is relevant here, section 546(e) applies to the Challenged Transfers in two separate ways. First, the Challenged Transfers are either margin or settlement payments made by

or to (or for the benefit of) forward contract merchants.  Second, the Challenged Transfers are transfers made by or to (or for the benefit of) forward contract merchants in connection with a forward contract.

**A.    The Challenged Transfers Are Protected Margin or Settlement Payments Under 11 U.S.C. §546(e)**

Section 546(e) applies to any transfer that is a (a) margin or settlement payment (b) made by or to (or for the benefit of) of a forward contract merchant.  Both elements are satisfied here.

*1.    The Challenged Transfers Are Margin Payments*

Margin payments are a "payment or deposit of cash, a security or other property, that is commonly known in the forward contract trade as original margin, initial margin, maintenance margin, or variation margin, including mark-to-market payments, or variation payments."  11 U.S.C. § 101(38).[7]  The term "margin payment" is construed broadly and includes any payment by the debtor to "reduce a deficiency in [a] margin account." *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 848 (10th Cir. 1990) (citing *In re Blanton*, 105 B.R. 321, 347 (Bankr. E.D. Va. 1989)); *see also In re Stewart Fin. Co.*, 367 B.R. 909, 917 (Bankr. M.D. Ga. 2007) ("'margin payment' is a broadly construed term and includes any payment by a debtor to . . . reduce a deficiency in a margin account."); *In re David*, 193 B.R. 935, 940 (Bankr. C.D. Cal. 1996) (finding that question of whether a transaction was a "margin payment" was matter of law and noting that

---

[7] *See also* 11 U.S.C. § 741(5) (defining margin payment as a "payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency"); 11 U.S.C. § 761(15) (defining margin payment as "payment or deposit of cash, a security, or other property, that is commonly known to the commodities trade as original margin, initial margin, maintenance margin, or variation margin, including mark-to-market payments, settlement payments, variation payments, daily settlement payments, and final settlement payments made as adjustments to settlement prices").

"'margin payment' also is interpreted very broadly and includes any payment by the debtor to reduce a deficiency in her margin account."). [8]

Here, it is apparent from the face of the Master Loan Agreement that the Challenged Transfers fit comfortably within this definition, as the Challenged Transfers rebalanced the loan-to-collateral ration and thus reduced Celsius' deficiency in its margin account under the Master Loan Agreement. Section IV(e) of the Master Loan Agreement, which governs the Challenged Transfers, is titled "Margin Calls." Am. Compl. Ex. B § IV(e). Pursuant to that section, Symbolic had the right to require Celsius to contribute additional collateral to bring the "Margin Call Level" back within the agreed-upon range if the market value of that collateral decreased sufficiently relative to the value of the outstanding loan balance. *Id.* The Master Loan Agreement and the Loan Term Sheets define the "Margin Call Level" as the "percentage agreed upon by the Parties" of the value of the collateral relative to the value of the outstanding loan balance. *Id.* Moreover, if Symbolic required Celsius to contribute more collateral, it had to send a "Margin Call Notice" to Celsius. *Id.*

Courts have found that similar transfers of collateral constitute margin payments. *Perkins v. Lehman Bros., Inc.* and *In re Stewart* are instructive. In *Perkins*, an appeal from an adversary proceeding seeking to avoid allegedly fraudulent transfers, the district court affirmed the bankruptcy court's decision that a hedge fund's prepetition deposits into its brokerage account were protected by the section 546(e) safe harbor. 2012 WL 11946959, at *1, 11-12 (N.D. Ga. Mar. 30, 2012). In so concluding, the district court pointed to the "margin features of the account

---

[8] The definition of "margin payment" is a question of statutory construction. *See In re Comark*, 971 F.2d 322, 324 (9th Cir. 1992) ("[Plaintiff] is trying to turn a question of law into a question of fact. The courts that have interpreted the meaning of settlement payment and margin payment treat the question as one of statutory construction.").

and the security interest granted to the brokers" and noted that "all deposited funds acted as collateral for the margin debt." *Id.* at *11-12. Similarly, *In re Stewart* involved an adversary proceeding in which the debtor sought to avoid and recover certain prepetition payments made by the debtor to Morgan Stanley. 367 B.R. at 910-11. *Stewart* held that because the disputed transfers "were deposits of cash or securities into an active margin account at a time when there was an existing debit cash balance" and used to "reduce margin debt," the disputed transfers were margin payments and unavoidable under section 546(e). *Id.* at 917. The Challenged Transfers here are functionally the same as those in *Perkins* and *Stewart*. As explained above, the Challenged Transfers rebalanced the loan-to-collateral ration and thus reduced Celsius' deficiency in its margin account under the terms of the Master Loan Agreement. They are therefore "margin payments" under the Bankruptcy Code.[9]

### 2. The Challenged Transfers Are also Settlement Payments

The Challenged Transfers are also safe-harbored settlement payments. The Bankruptcy Code defines settlement payments very broadly to include any "preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade." 11 U.S.C. § 101(51A). "In the forward contract context, it is

---

[9] Other courts have reached similar conclusions. *See Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 462 (S.D.N.Y. 2001) ("If the value of the securities in a repo account fell below an amount agreed upon by the parties, the 'margin amount,' then there was a 'margin deficit' and the broker had the right to make a 'margin call,' *i.e.,* to demand money or additional securities as collateral for the loan," and "if a proper margin call was not met, the broker had the right to liquidate the securities in the repo account."), *abrogated on other grounds by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011); *In re Adler Coleman Clearing Corp.*, 204 B.R. 111, 119-120 (Bankr. S.D.N.Y. 1997) (noting that Regulation T, "the SEC rule governing the issuance of credit by brokers, defines 'margin call' as 'a demand by a creditor to a customer for a deposit of additional cash or securities to eliminate or reduce a margin deficiency.'").

reasonable to construe 'settlement payment' as the payment that is made when an obligation under a forward contract becomes due," and may cover "one-on-one payments to meet such forward contracts' financial obligations." *In re Magnesium Corp. of Am.*, 460 B.R. 360, 374-75 (Bankr. S.D.N.Y. 2011); *see also In re Laurel Valley Oil Co.*, 2013 WL 832407, at *5 (Bankr. N.D. Ohio Mar. 5, 2013) (noting that the definition of settlement payment is broad and includes "the consideration to complete all obligations under the contract"); *In re Clean Burn Fuels, LLC*, 540 B.R. 195, 209 (Bankr. M.D.N.C. 2015) (observing that a "settlement payment" can be interpreted as broadly as "some kind of payment on a commodity forward contract").

The Amended Complaint, Master Loan Agreement, and Loan Term Sheets demonstrate, on their face, that the Challenged Transactions are settlement payments. The Master Loan Agreement provided for a "Balancing Transfer" arrangement under which the parties agreed that the ratio of the borrowed amount to the collateral would remain within certain parameters. Am. Compl. ¶ 31. The Loan Term Sheets set the lower limit of the ratio of the collateral to the borrowed amount at 90%. *Id.* Ex. C. As described above, Symbolic had the right to require Celsius to contribute additional collateral to bring the "Margin Call Level" back within range. *Id.* Ex. B § IV(e). So, in May and June of 2022, when the ratio of the ETH Symbolic held as collateral was less than 90% of the USDC it had lent to Celsius, Symbolic exercised its rights under the Master Loan Agreement and demanded that Celsius transfer additional collateral to rebalance the loan. *Id.* ¶¶ 34-35. Celsius made those transfers pursuant to the terms of the Master Loan Agreement and Loan Term Sheets. *Id.*

This is exactly the type of transaction that courts determine constitutes a settlement payment in the context of a forward contract. In *In re Olympic Natural Gas Co.*, 294 F.3d 737, 739, 742 (5th Cir. 2002) and *In re Borden Chemicals and Plastics Operating Ltd. Partnership*,

336 B.R. 214, 225 (Bankr. D. Del. 2006), each court determined that periodic payments pursuant to the terms of the parties' contracts following the delivery of natural gas constituted settlement payments that fell with section 546(e)'s safe harbor because they were payments made as part of a forward contract transaction.  In *In re Renew Energy LLC*, the court similarly held that payments made pursuant to contracts that allowed the participants to hedge against the risks of volatility in the gas market constituted settlement payments that were protected by section 546(e) because they were payments made pursuant to a forward contract.  463 B.R. 475, 481 (Bankr. W.D. Wisc. 2011). The Challenged Transfers are no different: by requiring Celsius to deliver ETH to Symbolic when the price of ETH declined to under 90% of the value of the USDC Celsius had borrowed, the parties effectively hedged their risk against the price volatility in the cryptocurrency markets and the transfers of ETH were payments made pursuant to a forward contract.

3.    *The Master Loan Agreement and Loan Term Sheets Are Forward Contracts*

The only other requirement for meeting the safe harbor is that Symbolic or Celsius be a "forward contract merchant."  Because any entity that deals "in whole or in part" in forward contracts constitutes a "forward contract merchant," *see infra Part* I.A.4, the only substantive question is whether the Master Loan Agreement and Loan Term Sheets are "forward contracts." The answer is unquestionably yes.  The Bankruptcy Code contains an exceptionally broad definition of "forward contract," encompassing any:

> contract (other than a commodity contract, as defined in section 761) for the purchase, sale, or **transfer** of a **commodity**, as defined in section 761(8) of this title, or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, **with a maturity date more than two days after the date the contract is entered into**, **including, but not limited to**, a repurchase or reverse repurchase transaction (whether or not such repurchase or reverse repurchase transaction is a "repurchase agreement", as defined in this section) consignment, lease, swap, hedge transaction, deposit, **loan**, option, allocated transaction, unallocated transaction, **or any other similar agreement**.

11 U.S.C. § 101(25) (emphasis added).

The Master Loan Agreement and Loan Term Sheets undoubtedly satisfy this broad definition.[10]

- They are a loan: "To constitute a loan there must be (i) a contract, whereby (ii) one party transfers a defined quantity of money, goods, or services, to another, and (iii) the other party agrees to pay for the sum or items transferred at a later date." *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000). Here, there was a contract pursuant to which Symbolic transferred Celsius USDC and received ETH as collateral to support that loan, and Celsius would repay Symbolic at a later date. Am. Compl. ¶¶ 32-33.

- Alternatively, there was a transfer of ETH to Symbolic as part of the margin call. *Id.* ¶ 35; Ex. A. The Bankruptcy Code defines "transfer" to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing or parting with property or an interest in property." 11 USC § 101(54)(D). As courts have repeatedly held, the definition of transfer is to be given its broadest possible definition. *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 475 n.22 (2d Cir. 2017) (noting that under the Bankruptcy Code, "'transfer' is to be construed as 'broad[ly] as possible.'" (quoting S. Rep. No. 95-989, at 27 (1978))); *In re Postiglione*, 2019 WL 2590946, at *7 (Bankr. E.D.N.Y. June 24, 2019) ("The term 'transfer' should be interpreted 'as broad as possible' to include any disposition of property" (quoting *In re Cedillo*, 573 B.R. 451, 468 (Bankr. E.D.N.Y. 2017))).

- There can be no question that the Master Loan Agreement and Loan Term Sheets are loans with a maturity date more than two days after execution. The Amended Complaint asserts that Celsius and Symbolic entered into the Master Loan Agreement on October 21, 2021, "pursuant to which Celsius would borrow certain digital assets or fiat currency from [Symbolic] from time to time as set forth in the Loan Term Sheets." Am. Compl. ¶ 29. The two relevant loans here had terms of three and six months. *Id.* ¶¶ 32-33.

- Finally, the subject matter of the Master Loan Agreement and Loan Term Sheets is a commodity. The Master Loan Agreement states that the borrower may "request from Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet." Am. Compl. Ex. B § II(a). The Master Loan Agreement defines "Digital Currency" to include "Ether (ETH)," among other cryptocurrencies. *Id.* Ex. B

---

[10] The Master Loan Agreement expressly incorporates the Loan Term Sheets and vice versa. Am. Compl. Ex. B. § XVI; Ex. C. We therefore treat the Master Loan Agreement and Loan Term Sheets as a single contract. *See In re Barnett*, 2015 WL 9581384, at *4 (Bankr. S.D.N.Y. Dec. 29, 2015).

§ 1.  The Bankruptcy Code points to the Commodity Exchange Act for the definition of a commodity.  *See* 11 U.S.C. § 761(8) (ascribing commodity with the definition given to it in the Commodity Exchange Act).  Multiple courts and regulators have concluded that digital assets like ETH are commodities.  *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228-29 (E.D.N.Y. 2018) (holding that virtual currencies are commodities under the Commodity Exchange Act because they are "'goods' exchanged in a market for a uniform quality and value" and goods and articles "in which contracts for future delivery are presently or in the future dealt in"); Complaint, *CFTC v. Eisenberg*, No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), ECF No. 1 at ¶ 15 (noting that the CFTC considers ETH a commodity under the Commodity Exchange Act), attached to the Shamah Declaration as Exhibit 2; Order, *In re iFinex Inc.*, CFTC Docket No. 22-05 (Oct. 15, 2021) at 2 n.2 ("[E]ther . . . along with other digital assets are encompassed within the broad definition of 'commodity' under Section1a(9) of the Act."), attached to the Shamah Declaration as Exhibit 3; Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, to List and Trade Shares of Ether-Based Exchange-Traded Products, Exchange Act Release No. 34-100224, SEC Docket (CCH) 2868062 (May 23, 2024) (detailing SEC's approval of Ethereum ETFs under the rules for commodity-based trust shares), attached to the Shamah Declaration as Exhibit  4.

In sum, the Master Loan Agreement and Loan Term Sheets constitute a forward contract under the plain language of the Bankruptcy Code and well-settled law.

### 4.    *Both Celsius and Symbolic Are Forward Contract Merchants*

Because the Master Loan Agreement and Loan Term Sheets constitute a forward contract, Symbolic and Celsius are also both forward contract merchants.  The Bankruptcy Code defines a "forward contract merchant" as an "entity the business of which consists ***in whole or in part*** of entering into forward contracts as or with merchants in a commodity (as defined in section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade."  11 U.S.C. § 101(26) (emphasis added); *see also In re Magnesium Corp.* 460 B.R. at 375-76 (defining a forward contract merchant as an entity that enters into forward contracts to generate profit).  Courts have also found that businesses that lend and borrow commodities are forward contract merchants.  *See In re First Class Import, Inc.*, 2009 WL 7215673, at *5 (Bankr. E.D.N.Y. Jan. 13, 2009) (finding that lenders in revolving credit and consignment agreement were forward contract merchants under the Bankruptcy Code).

Under this broad definition, both Celsius and Symbolic are forward contract merchants. Celsius' disclosure statement describes its primary business activities as: (1) "deploying digital assets transferred by users to generate income for Celsius and its operations and growth;" (2) lending cryptocurrency "to institutional clients such as hedge funds and market-makers;" (3) lending money to borrowers who "were able to choose from different loan products based upon loan-to-value (LTV) ratios of transferred digital assets ranging from 25% to 70%;" (4) decentralized finance lending; and (5) options agreements. Shamah Decl. Ex. 1 at 101-05. Thus, by its own admission, Celsius operated as a forward contract merchant, certainly with respect to its lending and options contract business lines.

By that same logic, Symbolic is also a forward contract merchant. Symbolic entered into at least two master loan agreements with Celsius, one as the borrower and one as the lender, under which the parties agreed to loan the other digital assets or fiat currency. Am. Compl. ¶¶ 29, 42; *see also In re Magnesium Corp.*, 460 B.R. at 375-76 (noting that where the challenged transactions were made pursuant to forward contracts between an entity and the debtor, the entity is operating as a forward contract merchant for purposes of section 546). While only one of Celsius and Symbolic needs to be a forward contract merchant for the safe harbor to apply, here both are. Because the Challenged Transfers were margin or settlement payments made by and to forward contract merchants, Plaintiff cannot avoid the transfers under Bankruptcy Code section 547(b).

**B.     The Challenged Transfers Were Made by Forward Contract Merchants in Connection with a Forward Contract**

The section 546(e) safe harbor independently applies to *any* transfer (not just margin or settlement payments) made by or to a forward contract merchant "in connection with" a forward contract. 11 U.S.C. § 546(e). As established above, the Master Loan Agreement is a forward contract and both Celsius and Symbolic are forward contract merchants. *See supra* Part I.A. Even

if they were not margin or settlement payments, the Challenged Transfers were made in connection with a forward contract, separately establishing that the safe harbor applies.

To start, the Second Circuit has construed the phrase "in connection with" exceptionally broadly, stating that it "sets a low bar for the required relationship between the . . . contract and the transfer sought to be avoided." *In re Bernard L. Madoff Invs. Sec. LLC*, 773 F.3d 411, 422 (2d Cir. 2014).[11] Here, the Challenged Transfers were made pursuant to express terms of the Master Loan Agreement and Loan Term Sheets and every step that led to the Challenged Transfers relates to or was otherwise made in connection with the Master Loan Agreement.

- First, the Master Loan Agreement states that the parties "may agree" that the "Borrower shall provide an amount of U.S. Dollars or Digital Currency as collateral for the Loan." Am. Compl. Ex. B § IV(a).  The Master Loan Agreement further grants the lender a "continuing first priority security interest in, and a lien upon" the collateral. *Id.*  In the two Loan Term Sheets, Celsius agreed to provide Symbolic with 6,276.15 ETH and 3,053.77 ETH respectively for the February and April 2022 loans.  Am. Compl. Ex. C.

- Second, the Master Loan Agreement states that if, "during the term of a Loan the Collateral Market Value for such Loan decreases relative to the outstanding Loan Balance by the percentage agreed upon by the Parties in the Loan Term Sheet," the lender "shall have the right to require the Borrower to contribute additional Collateral so that the Collateral Market Value is at least the same percentage as the Collateral Level indicated in the Loan Term Sheet relative to the then outstanding Loan Balance." *Id.* Ex. B § IV(e).  According to the Amended Complaint, Symbolic demanded that Celsius provide additional collateral to back up the February and April 2022 loans when the price of ETH crashed in May and June of 2022. *Id.* ¶ 35.  Exhibit A to the Amended Complaint details the six separate transfers of ETH in May and June that Celsius made to Symbolic in response to Symbolic's margin calls.

- Finally, the Master Loan Agreement provides that, in the event of a default, the lender may liquidate the collateral it held on its outstanding loan balances, including by "taking possession of the Digital Currency(ies) corresponding to the amount of failed repayment in accordance with its market price available on such date on a generally recognized exchange." *Id.* Ex. B § VIII.  The Amended Complaint alleges that Symbolic did exactly that on June 15, 2022. *Id.* ¶ 36.

---

[11] While the *Madoff* court construed section 546(e) in the context of a securities contract, the same statutory language applies equally to a commodity forward contract.

Where, as here, the underlying transfers are explicitly contemplated by the terms of an overarching agreement, those transactions are made "in connection with" that agreement. *See, e.g.*, *In re Boston Generating, LLC*, 2024 WL 4234886, at *2 (2d Cir. Sept. 19, 2024) (affirming holding on motion to dismiss that transfer of proceeds from loans "expressly contemplated" by credit facility agreements were made "in connection with" those agreements). Accordingly, the Challenged Transfers were made by forward contract merchants in connection with a forward contract and are not avoidable as preferences under the Bankruptcy Code.

## II. PLAINTIFF'S AMENDED COMPLAINT IS UNTIMELY

The Amended Complaint should also be dismissed because Plaintiff did not serve Symbolic within the timeframe prescribed by Federal Rule of Civil Procedure 4 and has no excuse for its delay. Federal Rule of Civil Procedure 4, made applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7004, requires that a plaintiff serve a defendant with the complaint within 90 days. Where a plaintiff fails to do so, the court should dismiss the action. *Zapata v. City of New York*, 502 F.3d 192, 199 (2d Cir. 2007).

### A. Plaintiff Did Not Serve Symbolic with the Complaint on Time

"If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). The filing of an amended complaint does not toll the service period on a defendant named in the original complaint. *See Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 607 (S.D.N.Y. 2012) (denying request for extension of service period under Rule 4). Plaintiff initiated this action on July 13, 2024, by filing the Complaint and a motion to seal. ECF Nos. 1, 2. The motion to seal sought permission to file Exhibits B and C to the Complaint entirely under seal. ECF No. 2. On August

2, 2024, the Court issued an order on Plaintiff's motion to seal, which directed Plaintiff to refile the Complaint with certain portions of Exhibits B and C redacted, rather than with the entire exhibit under seal. ECF No. 5. On August 7, 2024, the Court issued the summons with notice of pre-trial conference. ECF No. 6. Critically, Plaintiff never served Symbolic with the Complaint or the motion to seal. *See generally* Docket.

Plaintiff instead refiled the Complaint on August 12, 2024, after the statute of limitations had already run. ECF No. 7. In an apparent attempt to sidestep this deficiency, Plaintiff styled the filing as an "Amended Complaint," but the Amended Complaint was identical to the Complaint with the exception of the change to the filing of the exhibits mandated by the Court. *Id.* On October 18, 2024, Plaintiff requested that the Court issue a second summons. The Court did so that same day. ECF No. 8. Only on October 21, 2024, did Plaintiff finally serve Symbolic with a copy of the Complaint, "amended" or otherwise. ECF No. 9. October 21, 2024, was 100 days from the date of the initiation of this action and ten days past Federal Rule of Civil Procedure 4's 90-day limitation. Even using October 18, 2024, the date Plaintiff requested a second summons, puts Plaintiff a week past the 90-day deadline.

**B.      Plaintiff's Failure to Serve Symbolic with the Complaint Is a Result of Its Own Neglect**

The court may extend the deadline for service if a plaintiff can show "good cause" for the delay. "Good cause is measured against the plaintiff's reasonable efforts to effect service and the prejudice to the defendant from the delay, and the court should look to whether the plaintiff was diligent in making reasonable efforts to effect service." *Gong v. Sarnoff*, 2023 WL 8096970, at *2 (S.D.N.Y. Nov. 21, 2023). "Good cause is generally found only in exceptional circumstances where the plaintiff's failure to serve process . . . was the result of circumstances beyond its control." *E. Refractories Co. v. Forty Eight Insulations, Inc.*, 187 F.R.D. 503, 505 (S.D.N.Y. 1999).

Here, Plaintiff's failure to serve Symbolic with the Complaint was entirely its own fault. As detailed above, Plaintiff was actively litigating this matter, including appearing for a hearing before the Court on July 29, 2024, filing an Amended Complaint on August 12, 2024, and requesting a second summons on October 18, 2024. ECF Nos. 4, 7, 8. Moreover, as the Amended Complaint notes, Symbolic filed proofs of claim in the underlying bankruptcy proceeding so its contact information, as well as its counsel's information, was available to Celsius. Am. Compl. ¶ 42. Celsius also had access to Symbolic's address and legal department's email address through the notice provision of the Master Loan Agreement. *Id.* Ex. B § XIV. And it is not as if serving Symbolic posed any real difficulty: Symbolic is incorporated in Delaware and has a designated agent for service of process in that state. *Id.* ¶ 10; Shamah Decl. Ex. 5. Yet, at no point during the three months allotted to Plaintiff did it take the routine steps to properly effectuate service on a Delaware entity or request more time from Symbolic or the Court to complete service.

Courts routinely find a lack of good cause where the delay in service is the result of the attorney's own "inadvertence, neglect, mistake or misplaced reliance." *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282, 306 (S.D.N.Y. 2013) (finding lack of good cause where record demonstrated lack of diligence on part of plaintiff in serving defendants); *see also, e.g.*, *Counter Terrorist Grp. U.S. v. New York Mag.*, 374 F. App'x 233, 235 (2d Cir. 2010) (holding that counsel's miscalculation of Rule 4(m)'s service period and delay in attempting service until the end of that period did not constitute good cause); *Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187, 205 (S.D.N.Y. 2024) (finding that failure to seek an extension and minimal efforts to serve defendant did not constitute good cause). Here, there is no excuse for Plaintiff's failure to do the basic diligence necessary to serve a Delaware entity within the time limits afforded by Rule 4(m).

### C.     The Court Should Not Grant Plaintiff a Discretionary Extension

Where the plaintiff cannot show good cause, dismissal of the action may be appropriate. *Counter Terrorist Grp. U.S.*, 374 F. App'x at 234.  Courts in this District typically apply a four-part balancing test to determine whether a discretionary extension is warranted in the absence of good cause:  "(1) whether any applicable statutes of limitations would bar the action once re-filed; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether defendant attempted to conceal the defect in service; and (4) whether defendant would be prejudiced by extending plaintiff's time for service."  *George*, 221 F. Supp. 3d at 435 (internal quotations omitted).[12]  All four factors favor dismissal.

#### 1.     The Statute of Limitations Would Bar Plaintiff's Claims

While a statute of limitations bar on the plaintiff's claims can weigh in favor of an extension, it can also weigh against one.  *Zapata*, 502 F.3d at 198.  In situations where there is no good cause, "no weighing of the prejudices between the two parties can ignore that the situation is the result of the plaintiff's neglect."  *Id.*

That is precisely the situation here.  Not only did Plaintiff wait until the last possible moment to file its Complaint, Plaintiff compounded that error by failing to serve Symbolic with the Complaint or the motion to seal, or to even reach out to Symbolic or the Court regarding service of either document.  ECF No. 1; Docket.  Whether the result of malice or sloppiness, this is the type of behavior courts routinely hold is insufficient to overcome the prejudice of a lapsed statute

---

[12] It is questionable whether the Court needs to analyze these four factors, because courts will dismiss a claim for failure to timely serve even when the four-factor test favors the plaintiff, if the plaintiff's failure to serve is particularly egregious. *See Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 404 (S.D.N.Y. 2020) ("Even if the balance of hardships favors the plaintiff, a district court may still decline" to grant an extension "where the plaintiff fails to advance some colorable excuse for neglect").

of limitations.  *See Zapata*, 502 F.3d at 198-99 (upholding district court's dismissal under Rule 4(m) where statute of limitations would bar plaintiff from refiling, because plaintiff made no effort to serve the defendant despite having the defendant's contact information and never asked the court to bless its untimely service); *Kogan*, 334 F.R.D. at 405 (finding that statute of limitations bar did not justify a discretionary extension because (1) plaintiff did not "make any effort to timely serve defendants or to ask for a waiver," (2) plaintiff had actual knowledge of the looming statute of limitations deadline, and (3) defendants did nothing to induce the expiration of the limitations period); *Cassano*, 186 F. Supp. 3d at 323-24 (declining discretionary extension even where claims would be barred by the statute of limitations because plaintiff had no justifiable excuse for failing to properly serve defendants).

### 2.  *Symbolic Was Unaware of the Current Action Until It Was Served*

The next factor courts consider is whether the defendant had actual notice of the claims filed against it.  *George*, 221 F. Supp. 3d at 436.  An extension after a lack of timely service is significantly more prejudicial to a defendant that is unaware of the lawsuit because it is unable to mitigate any failure to serve and clearly could not have caused the untimely service.  *Cf. Kogan*, 334 F.R.D. at 406 (praising defendant for raising service defects with plaintiff).  Courts are therefore more likely to dismiss an action against a defendant who was not timely served if the defendant did not have actual notice of the claims against it.  *Zapata*, 502 F.3d at 198-99; *In re Teligent*, 485 B.R. 62, 71-72 (Bankr. S.D.N.Y. 2013).

Here, while Symbolic filed proofs of claim in the bankruptcy case, it had no actual notice that a lawsuit had been filed against it.  Plaintiff never contacted Symbolic, did not serve Symbolic with the Complaint, did not serve Symbolic with the motion to seal, and only served Symbolic with the Amended Complaint ten days after the 90-day service window expired.  Docket; ECF No.

9.  This factor thus weighs in favor of dismissal.  *Zapata*, 502 F.3d at 198-99 (finding that lack of actual notice amplified prejudice to defendant and affirming dismissal under Rule 4).

### 3.  *Symbolic Could Not Have Concealed the Defect in Service*

The third prong of the analysis looks to whether the defendant concealed or attempted to conceal the defect in service.  *George*, 221 F. Supp. 3d at 436.  "While it is generally 'the responsibility of his attorney—and not the Court or Defendants—to ensure that all Defendants [are] properly served with [a] . . . Complaint in a timely manner,' courts will more readily excuse a failure of service if a defendant has concealed the plaintiff's error."  *Fantozzi v. City of New York*, 343 F.R.D. 19, 30 (S.D.N.Y. 2022) (internal citations omitted).

Symbolic could not possibly have concealed or tried to conceal the defect in Plaintiff's service, as Symbolic had no idea Plaintiff initiated this adversary proceeding against it until ten days after the deadline for service had passed.  ECF No. 9.  If anything, Plaintiff tried to game the system by (1) failing to serve Symbolic with the motion to seal and (2) refiling the original Complaint as an Amended Complaint even though the Complaint and Amended Complaint are identical.  *Compare* ECF No. 1 *with* ECF No. 7; *see also* Docket.  Where, as here, the defendant did not play a role in the plaintiff's failure to timely effectuate service, this factor weighs in favor of dismissal.  *See Fantozzi*, 343 F.3d at 30 ("[b]ecause Defendants did not attempt to conceal the defect in service, the third factor cuts against granting an extension.").

### 4.  *Symbolic Will Suffer Prejudice*

The final inquiry is whether the defendant will suffer prejudice if the court extends the plaintiff's time to serve the complaint.  *George*, 221 F. Supp. 3d at 437.  Where the service period and statute of limitations have expired, "extending the service period beyond the statute of limitations" prejudices defendants.  *Cassano*, 186 F. Supp. 3d. at 322-23.

As explained above, *supra* II.A, C.1, both the service period and statute of limitations have expired. The limitations period on Plaintiff's preference claim expired over seven months ago because Plaintiff chose to file this adversary proceeding on the last possible day. 11 U.S.C. § 546(a); ECF No. 1. Plaintiff was also ten days late to serve Symbolic with a copy of the Amended Complaint for no apparent reason. Fed. R. Civ. P. 4(m); ECF No. 9. Courts frequently reject discretionary extensions and dismiss actions in similar scenarios. *See, e.g.*, *Zapata*, 502 F.3d at 199 (holding that defendant would be prejudiced by extension of service period and affirming dismissal where plaintiff blew substantive and procedural statutes of limitation); *Fantozzi*, 343 F.R.D. at 31 (finding that defendants would be prejudiced by an extension in part because of obligation to spend time, money, and resources litigating time barred claims and dismissing claims where plaintiff failed to timely serve complaint on defendants and statute of limitations had run); *Kogan*, 334 F.R.D. at 406 (same).

Retroactively granting Plaintiff a discretionary extension would be especially prejudicial to Symbolic here because Plaintiff's claims are irredeemably flawed and should be dismissed for substantive reasons. *See supra* Part I. Forcing Symbolic to spend additional time, money, and resources litigating these deficient claims—claims that a second amended complaint could not cure—is not an efficient use of Symbolic or the Court's resources and favors dismissal of the Amended Complaint. *Kogan*, 334 F.R.D. at 406.

## III. PLAINTIFF'S AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiff cannot amend its Complaint in a way that could resurrect its preference claims, so the Amended Complaint should be dismissed with prejudice. "Dismissal with prejudice is appropriate . . . where '[t]he problem with [plaintiff's] causes of action is substantive' such that amendment would be futile." *Owoyemi v. Credit Corp. Sols.*, 596 F. Supp. 3d 514, 521 (S.D.N.Y.

2022).  Here, the Master Loan Agreement and Loan Term Sheets are attached to and integrated into the Amended Complaint and unambiguous on their face.  Plaintiff cannot plead around the terms of those agreements, which unquestionably establish that the Challenged Transfers fall within section 546's safe harbors.  *See Dale v. L'Oreal USA, Inc.*, 2023 WL 3984345, at \*8-9 (E.D.N.Y. June 13, 2023) (dismissing with prejudice plaintiff's claims that could not be replead in a way that would state a claim).

Moreover, no amendment can cure Plaintiff's failure to timely serve Symbolic with the Complaint or Amended Complaint.  The Court need not rely on the facts in the Amended Complaint or any future complaint to conclude that the statutes of limitation under Rule 4 and Bankruptcy Code section 546(a) have expired.  It is evident from the docket in this adversary proceeding and the docket in the underlying bankruptcy—both of which are judicially noticeable, *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)—that Plaintiff did not meet the service deadline under Rule 4(m) and as such, the statute of limitations on its preference claims has run.  Nor can Plaintiff argue that the filing of the Amended Complaint restarted the 90-day service clock such that it timely served Symbolic with the Amended Complaint on October 21, 2024.  *See Sikhs for Justice*, 893 F. Supp. 2d, at 607 ("The filing of an amended complaint . . . does not restart the [90] day period for service under Rule 4(m).").

## CONCLUSION

For all the reasons set forth above, Symbolic respectfully requests that the Court enter an order, substantially in the form attached to the Notice of Motion as Exhibit A, dismissing the Amended Complaint with prejudice.

Dated: New York, New York
February 24, 2025

Respectfully submitted,

COOLEY LLP

By: */s/ Daniel Shamah*

    Daniel Shamah
    Paul Springer
    Charles Low
    55 Hudson Yards
    New York, NY 10001
    Phone: (212) 479-6000
    Email: dshamah@cooley.com

    *Counsel for Defendant Symbolic Capital*
    *Partners Ltd.*